In re Mary Lou COLE, Debtor.

Mary Lou COLE, Plaintiff,

v.

SOVRAN MORTGAGE CORPORATION
f/k/a VNB Mortgage Corporation,
Defendant.

Bankruptcy No. 87–03928S.
Adv. No. 87–0821S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 15, 1988.

Irwin Trauss, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Lawrence T. Phelan, Philadelphia, Pa., for Mortgagee.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant matter requires us, as in *In re Corbett,* 80 B.R. 32 (Bankr.E.D.Pa.1987), to focus upon another of the difficult issues surrounding an effort by a debtor to avoid a sheriff's sale of her home by means of 11 U.S.C. §§ 548(a)(2)(A) and (B)(i), which we discussed in our recently-affirmed decision in *In re Butler,* 75 B.R. 528 (Bankr.E.D.Pa.1987), *aff'd,* C.A. No. 87–04455 (E.D.Pa. Dec. 18, 1987). The particular legal issue presented by this proceeding is the proper method to be utilized to determine whether a mortgagee who purchases the debtor's property at a sheriff sale for a bid which is less than the amount of the foreclosure judgment which is the basis of the sale has given "reasonably equivalent value" for the property, for purposes of 11 U.S.C. § 548(a)(2)(A).

We hold that, in such a situation, "reasonably equivalent value" is not received when the bid price is less than seventy (70%) percent of either (1) the total of liened obligations against the property satisfied by the sheriff's sale compared to the value of the property; or (2) the bid price paid at the sale compared to the value of the debtor's equity lost in the sale. Because we find that the Debtor here did not receive "reasonably equivalent value" for her property by either of the alternative aforesaid measures, we shall enter an order avoiding the sale in issue.

However, we reject the Debtor's suggestion that the sale was not effected in good faith, and we hold that the Defendant-mortgagee is entitled to a lien on the premises,

in an amount to be subsequently ascertained, pursuant to 11 U.S.C. § 548(c). We also wish to be sure that the Debtor is making payments which, under her plan, will be necessary for her to pay off her mortgage and save her home in this Chapter 13 case, and we direct her to do so if she is not already doing so. Finally, in light of this disposition, we shall deny the Mortgagee's Motion for relief from the automatic stay.

The Debtor and Plaintiff in the adversarial proceeding in issue, MARY LOU COLE (hereinafter referred to as "the Debtor"), filed the underlying Chapter 13 bankruptcy case on August 4, 1987. On September 4, 1987, the Debtor filed the adversarial proceeding before us. The Debtor's mortgagee and the Defendant in the Adversarial proceeding, SOVRAN MORTGAGE CORPORATION (hereinafter referred to as "the Mortgagee"), filed an Answer to the adversarial Complaint including an "unclean hands" defense due to the Debtor's purported multiple past bankruptcy filings on October 15, 1987, and followed this with a Motion for relief from the automatic stay to allow it to proceed with a post-sale ejectment action against the Debtor on October 20, 1987.

After they were initially scheduled separately, the adversarial proceeding and the stay motion were listed together on a must-be-tried basis on December 15, 1987. On that date, the parties presented us with a rather lengthy Stipulation of Facts, which they agreed could constitute the record on both matters, and presented oral argument. Since we had no opportunity to study the Stipulation, we took the matter under advisement and requested the parties to submit Briefs in support of their respective positions, the Debtor on or before December 31, 1987, and the Mortgagee on or before January 11, 1988. The Debtor tardily remitted her Brief on January 6, 1988. The Mortgagee submitted a timely, but very short Brief which, in lieu of analysis, characterized the Debtor's arguments as "very silly" and, more picturesquely, as "trying to dress a duck in an elephant suit in the hope that the Court won't notice."

The Stipulation is quite clear about numerous facts, but leaves open for our determination the very significant issue of determining the value of the Debtor's premises. It provides that, on September 8, 1986, the Mortgagee purchased the Debtor's premises at its own foreclosure execution sale for a bid of $3,600.00. The underlying foreclosure judgment, obtained in an action commenced in state court in 1981, was in the amount of $11,755.41. Admitted into the record is the sheriff's docket indicating that $2,768.15 was distributed to the Department of Revenue of the City of Philadelphia on tax ($540.52) and water and sewer rent ($2,227.63) claims, and that the balance was allocated to transfer taxes and costs associated with the sale.

Although the parties did not stipulate to the value of the premises, they stipulated that the following three documents "may be considered by the court as evidence of *inter alia* the fair market value of 5838 North Marshall Street [Philadelphia, PA 19120, the premises in issue] on the date of the sheriff's sale on October 6, 1986,[1] ...:"

1. A real Estate Transfer Tax affidavit, on which the Mortgagee's counsel swore that the "fair value" of the premises, as of the date of the Deed, October 2, 1986, was $22,290.00.

2. An Appraisal Report of the premises performed as of December 18, 1986, by one Edward V. Graham, estimating the "market value" of the premises at $19,000.00.

3. A Notice of Real Estate Assessment from the City dated May 23, 1985, reciting the 1985 and 1986 "market value" of the premises as $20,300.00.

The parties further stipulated that the Debtor was insolvent both at the time of the sale and as a result thereof. Finally, we note that, attached to the Stipulation was the Debtor's Chapter 13 Plan, contem-

---

1. The date of the sale was actually September 8, 1986. October 6, 1986, was the date that the Deed was issued. Consistent with our holding in *Butler* that the "transfer" occurs on the date that the Deed passes, 75 B.R. at 532–33, we deem October 6, 1986, to be the significant date as of which to make the valuation process.

plating 60 monthly payments of $5.00 each to the Trustee, but also providing that the Mortgagee would be paid $200.00 monthly for sixty (60) months outside of the Plan.

We are obliged to make one important factual determination, as indicated *supra, i.e.,* the value of the premises. We find that the value of the premises, as of October 6, 1986, was $22,290.00, the figure recited by the Mortgagee's counsel on the Transfer Tax Affidavit. In reaching this decision, we reiterate several of the considerations which we weighed in making similar valuation determinations in the face of conflicting evidence in *In re Chandler,* 77 B.R. 513, 516–17 (Bankr.E.D.Pa.1987); and *In re Blakey,* 76 B.R. 465, 469–72, *modified,* 78 B.R. 435 (Bankr.E.D.Pa.1987). In *Blakey,* we were compelled to weigh the impact of a "liquidation report" prepared by one of the parties to that proceeding, the United States Department of Housing and Urban Development (hereinafter referred to as "HUD"). Although this report was five years removed in time from the crucial date at which we had to fix value in that case, we deemed the report particularly useful because it was prepared by a party's agent for a different purpose than was involved at trial and hence appeared to constitute an unbiased admission of value by that party. We ultimately determined that the value of the premises in issue there was $12,000.00—the precise amount recited in the HUD Liquidation Report.

In reaching our decision in *Blakey,* we also determined that the estimate of value submitted by the Debtor and her appraiser—the selfsame Edward V. Graham whose report was entered into the record via the Stipulation of Facts here—were too low and that of the mortgagee's appraiser too high.

In *Chandler,* we declined to give any weight to a professional appraisal entered into the record, as here, by stipulation of the parties but without supporting testimony from the appraiser. Citing to *Blakey, supra,* we said, 77 B.R. at 517:

> comparable sales data is only as useful as the determination of with what the subject property has been compared.

Analysis of the condition of the premises and the elements taken into consideration by the appraiser, including an analysis of the neighborhood, are elements which are very important in our determination of the relative weight to be given to appraisals of property by real estate brokers. *See In re Caster, Caster v. United States,* 77 B.R. 8, 10, 14–15 (Bankr.E.D.Pa.1987); and *Blakey, supra,* 76 B.R. at 467, 472. Without live testimony ... we had nothing from [the appraiser] but his bare allegedly "comparative sales" data. His credentials, the degree of care which he utilized in performing his inspection and the weight which he gave to the condition of the premises, are completely unknown.

We are, as indicated by our Opinion in *Blakey,* somewhat more familiar with Mr. Graham than with the appraiser whose report was in issue in the foregoing discussion in *Chandler.* However, in our *Blakey* Opinion, we termed Mr. Graham as "an easy target for criticism" and "sloppy" in his work-product. 76 B.R. at 471. Here, his appraisal is based solely upon three comparable sales of properties virtually identical to the subject-premises which were sold in the same block in September and October, 1986. Although these homes were sold for $29,900.00 (two doors away), $31,900.00, and $26,000.00, respectively, by his making a reduction of an apparently arbitrary $5,000.00 amount for the poor "condition" of the subject premises; and a further reduction of $6,000.00 on the first two premises and $2,000.00 on the third premises for an equally arbitrary "functional utility" deficit in the subject premises, Mr. Graham arrived at a $19,000.00 figure via strictly a "market approach." A "cost approach," performed elsewhere on the appraisal form but not considered, yielded a $30,000.00 figure.

Although admittedly the *Blakey* debtor was calling Mr. Graham to attempt to minimize the value determination, as that case involved a determination pursuant to 11 U.S.C. § 506(a), we found there, as in many of his other appraisals presented before us, that Mr. Graham simply tends to aim low in

his appraisal figures. We are therefore unwilling to give much credence to his appraisal, except to assume that, as in his other reports, the figure which he arrived at represents the low-end value of the premises.

We are unwilling to give much, if any, weight to the City's "appraisal" of the premises. *Compare Blakey,* 76 B.R. at 471 n. 7 (City's appraisal not considered). We have even less indicia of what went into this determination than we do of that of Mr. Graham.

Meanwhile, the Mortgagee's own statement of value, by its competent and eminent counsel, whose credibility and judgment are worthy of respect, is accorded significant weight by us. Counsel had every incentive to minimize the value figure on this form, since it appears that the higher the value figure on the form, the higher the transfer tax that the Mortgagee would be obliged to pay. Like the HUD Liquidation Report, the affidavit of counsel is in the form of an admission of a party's agent provided for a different purpose than that at hand, and thus clearly unbiased. Moreover, unlike the HUD Report, the affidavit here directly addresses the value of the premises at almost precisely the pertinent date. We need, therefore, make no guess of the date of the appraisal, as in the case of the City's appraisal, or adjust the figure for deterioration or appreciation, as in the case of Mr. Graham's report.

We therefore find, as a matter of fact, although on a less than satisfying paper record which both counsel nevertheless chose to let stand unsupplemented, that the fair market value of the Debtor's premises, as of October 6, 1986, was $22,290.00.

Having resolved the pertinent factual issue, we turn to the pertinent legal issue. We begin by quoting the applicable Code provision, 11 U.S.C. §§ 548(a)(2)(A) and (B)(i):

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within

one year before the date of the filing of the petition, if the debtor—

> .        .        .        .        .

> (2)(A) received less than a reasonably equivalent value in exchange for such transfer of obligation; and

> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; ... [or other non-applicable alternatives exist].

As we explained in *Butler,* 75 B.R. at 530, the Debtor is entitled to step into the shoes of the trustee in a sheriff's sale situation by means of 11 U.S.C. §§ 522(h) and (g)(1). Insolvency is clearly established. The only area somewhat unclear, even after our decisions in *Corbett* and *Butler,* is how it is ascertained whether the debtor received "less than a reasonably equivalent value" for her premises in a transaction where the mortgagee is itself the purchaser at its own foreclosure sale of the premises.

In both *Corbett,* 80 B.R. at 36–37, and *Butler,* 75 B.R. at 531–32, we indicated an intention to follow the benchmark established in *Durrett v. Washington National Insurance Co.,* 621 F.2d 201, 203–04 (5th Cir.1980), that a sale yielding less than seventy (70%) percent of the fair market value of the property sold would be deemed "less than a reasonably equivalent value." In *Corbett,* where a third-party purchaser was present who satisfied the debt executed upon in the sheriff's sale and presumably all other senior liens, the task of measurement was relatively easy. We simply compared the bid price to the value of the premises.

We believe that the comparison of the bid price to the value of the premises is indeed appropriate when the purchaser, be it a third-party or the judgment creditor itself, *see In re Jones,* 20 B.R. 988, 993–94 (Bankr.E.D.Pa.1982) (per GOLDHABER, CH. J.), bids a figure in excess of the judgment and other senior liens. Clearly, if we used that comparison here, the sale price of $3,600.00 would have been grossly below seventy (70%) percent of the fair

market value of the premises, determined to be $22,290.00.

However, our decision in *Butler* suggests that this approach is not favored when the judgment creditor bids a figure less than his judgment at his own sheriff's sale, and the decision of Chief Judge Twardowski of this court in *In re Brunell*, 47 B.R. 830 (Bankr.E.D.Pa.), *aff'd*, 76 B.R. 64 (E.D.Pa.1985), expressly rejects this approach in such a factual setting. We observe that there are at least four different methods for determining whether "reasonably equivalent value" is realized in a situation where the successful bidder at a sheriff's sale is a judgment creditor who bids less than the amount of his judgment. These are as follows:

1. Compare the bid price to the sale price, irrespective of the judgment and liens against the premises, on the ground that the creditor's judgment is irrelevant, *see Butler*, 75 B.R. at 531 n. 4. Support for this approach is derived from the Pennsylvania Supreme Court's decisions in *Peoples Pittsburgh Trust Co. v. Blickle*, 330 Pa. 398, 199 A. 213 (1938); and *Home Owners Loan Corp. v. Eiden*, 329 Pa. 532, 198 A. 114 (1938).

2. Compare the valid liens cleared off in the sale to the value of the premises. This was the approach which we utilized in *Butler*, and it appeared consistent with the analyses of the courts in *Brunell; In re Dudley*, 38 B.R. 666, 669–70 (Bankr.M.D. Pa.1984) (per GIBBONS, J.); and *In re New Yorketown Associates*, 40 B.R. 701, 706–07 (Bankr.E.D.Pa.1984) (per GOLDHABER, CH. J.). However, we note that, in *Butler*, we expressed concern as to whether this method of measurement was indeed the desideratum. See 75 B.R. at 531 n. 4.

3. Add the bid price to the creditor's judgment and compare the sum to the value of the premises. This was the method utilized by Judge Twardowski in *Brunell*, but we declined to follow same in *Corbett*, at 37; and *Butler*, 75 B.R. at 531 n. 4.

4. Compare the bid price to the equity lost by the Debtor in the sale. This is the approach which we deemed superior, but

did not consider it necessary to utilize, in *Butler*, 75 B.R. at 532 n. 4.

We continue to reject the third method of computation, as, apparently, the district court did in *Brunell, supra*, 76 B.R. at 66–67 n. 2, when it plugged in certain hypothetical figures which contrasted to those in *Brunell*. Despite the support for the first method in the Pennsylvania Supreme Court decisions cited *supra*, a more recent state appellate decision has questioned this result, *Vend–A–Matic, Inc. v. Frankford Trust Co.*, 296 Pa.Super. 492, 499, 442 A.2d 1158, 1162 (1982). The district court, in *Brunell*, expressly held that "[r]ecent developments in the bankruptcy area ... undermine whatever precedential value these cases may have had." 76 B.R. at 66–67. Judge Goldhaber also expressly rejected the applicability of their reasoning in *New Yorketown, supra*, 40 B.R. at 707 n. 10.

Thus, only two viable methods remain. We hold that a court should consider both of these methods and, if either one yields a ratio of less than seventy (70%) percent, the sale should be subject to being set aside.

Both methods, we believe, tend to yield results which address the issue which is really at stake: was the debtor's estate unreasonably depleted as a result of the transfer? As we suggested in *Butler*, the fourth method is preferable in directly serving this purpose. What the debtor's estate loses in the sale is the debtor's equity of the property sold. This should be compared to the outlay of the mortgagee-purchaser at the sale to wipe out this interest of the estate. In this way, it can be ascertained whether the debtor's loss of equity was reasonably equivalent to the sum received at the sale.

The second method compares the liens and encumbrances removed by the sale, which constitute the benefit to the debtor from the sale, to the value of what the debtor is losing, i.e., premises of a certain value. This method was that which we actually utilized in *Butler*, and hence has the imprimatur of the district court by reason of *Butler's* affirmance. It should also be noted that this method assumes the accuracy of the reasoning of the district

court in *Brunell,* 76 B.R. at 67–68, that, because of the presence of the Deficiency Judgment Act, 42 Pa. C.S.A. § 8103, a sheriff's sale of realty eliminates any right of the executing judgment creditor to a deficiency in the sale price unless a petition to fix the fair market value pursuant to the act is filed within six months of the sale *and* that a deficiency exists after the fair market value is fixed.[2]

We reject the contention of the Mortgagee, suggested in our colloquy with counsel on December 15, 1987, that any method except the third method ignores the realities of a sheriff's sale at which no third party bids on a premises listed for sale, and thus at which the actual bid of the judgment creditor consists of its own judgment plus the nominal sum bid by it. The mortgagee has in its power the ability to bid any amount up to that of its own judgment, suffering only certain unexplained adverse financial consequences as a result of not bidding the entire amount of its judgment. Any purported addition in costs to the Mortgagee when it bids at or close to the amount of its judgment would appear to us to be a cost of doing business which we believe that such parties must assume if they seek to not only wipe out a considerable equity of the mortgagor, but to preclude the mortgagor from attacking the sale on the basis of § 548 in a subsequent bankruptcy proceeding, which are the only circumstances where the bid amount could later become relevant.

■ Applying either of the alternative methods which we hold should be utilized leads to the same result: the transfer of the premises effected on October 6, 1986, was for a sum less than seventy (70%) percent of the value of the Debtor's home. In applying the fourth method, we compare the bid price of $3,600.00 to the Debtor's equity lost in the sale. That figure is $22,290.00, less the sum of the $11,755.41 mortgage balance and the $2,768.15 in City liens paid off in the sale, a sum of $14,523.56, which yields a net equity figure of $7,766.44. The bid is only 47.7% of this figure, well below the requisite seventy (70%) percent. In applying the second method, we compare the $14,523.56 sum to the $22,290.00 property value, and the result is a percentage figure of 65.1%, also below the *Durrett* benchmark.

■ Having determined that the sale may be set aside does not constitute an unmitigated blessing for the Debtor and thus, as the Mortgagee suggests, an undeserved windfall to her. Contrary to the Debtor's suggestion, we believe that it is clear that the Mortgagee is entitled to have its lien satisfied in the sale reinstated against the premises under 11 U.S.C. § 548(c) when the sale is set aside. We read § 548(c) as addressing solely the issue of whether the transferee or obligee, i.e., the purchaser at the sale, has a right to a lien against the Debtor's premises in light of the frustration of his bargain. It is the good faith of the purchaser which is the measure of whether a lien is warranted. There is no suggestion in § 548(c) that a judgment creditor whose lien was satisfied in the avoided sale should not have this lien reinstated. When a judgment creditor purchases at his own sale, he has rights in two capacities, i.e., as judgment creditor and as purchaser. We believe that, pertinent to its capacity as judgment creditor, nothing in § 548(c) suggests that it should lose its judgment lien, no matter what the circumstances of the sale were. The question of the judgment creditor's good faith is only relevant in determining whether it is enti-

---

**2.** Different consequences clearly would ensue if the sheriff's sale involved property other than realty, since the Deficiency Judgment Act would then be inapplicable. In such a case, the debtor's liability would be reduced only by the amount of the sale price. Also, in light of the holding that a Veteran's Administration (hereinafter referred to as "VA") indemnity claim is not subject to the terms of the Deficiency Judgment Act, *see United States v. Shimer,* 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961), there is some doubt as to whether different consequences should ensue in the case of a foreclosure sale involving a governmentally-insured mortgage in which the government retains a right to indemnity against the Debtor. This is certainly true of a VA-guaranteed mortgage in light of *Shimer* and may be true in the case of a mortgage, such as the mortgage of the Debtor in issue, insured by the Federal Housing Administration and subject to assignment to that agency. *See* 24 C.F.R. § 203.360.

tled to an additional lien for any outlay of value to the Debtor pertinent to its capacity as purchaser.

Furthermore, we perceive no lack of good faith on the part of the Mortgagee, as we defined that term in *In re Gathright,* 67 B.R. 384, 388 (Bankr.E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987), in its capacity as purchaser. No element of dishonesty, malice, or fraudulent design, any of which would have to be proven by the Debtor, appears on this record.

Therefore, as in *Butler,* 75 B.R. at 533; and *Corbett,* at 38–39, we shall expressly allow the Mortgagee to assert a lien pursuant to § 548(c) for its judgment lien satisfied in the sale, plus possibly its costs expended in purchasing the premises at the sheriff's sale. We believe that the amount of the lien can most fairly be determined by a procedure such as that which we set forth in *Corbett,* whereby the amount of the lien will be ascertained in a separate claims process. We shall therefore follow that procedure in our accompanying Order.

Finally, as in *Corbett* and *Butler,* we turn to examination of the Debtor's Plan and performance therewith to determine whether her goal of saving her home is a realistic one, and thus whether a decision giving her an opportunity to do so would be wasted effort. We are dismayed to note that the Debtor is alleged to be almost six years delinquent in her mortgage payments and was initially remiss in paying even the installments on her filing fee in this court. On the other hand, the parties stipulated that the Debtor has owned and lived in the property for sixteen (16) years, and therefore we infer that she made mortgage payments for over ten (10) years before her delinquency arose, thus establishing some equities in her favor. However, if her purported goal is to pay off the full mortgage balance within the maximum 60–month duration of a Chapter 13 Plan, rather than, as the Mortgagee suggests, "to perpetuate her free occupation of the premises" a little longer, the Debtor must not fall behind in remitting monthly payments of at least the $200.00 called for by the Plan to the Mortgagee. We have no statement in the record as to whether she has commenced these payments, although the Mortgagee's Brief suggests that she has not. If not, we shall direct the Debtor to do so beginning in February, 1988, in order that we can determine the feasibility of her Plan at the Confirmation Hearing, scheduled on March 29, 1988.

We shall therefore include such directives in our accompanying Order.