In re Michaeline Valentine
D'ALFONSO, Debtor.

Michaeline Valentine D'ALFONSO,
Plaintiff,

v.

A.R.E.I. INVESTMENT CORP., Sheriff
of Philadelphia, Defendants.

Bankruptcy No. 96–30515DAS.
Adversary No. 97–0443DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 4, 1997.

James J. O'Connell, Philadelphia, PA, for debtor.

Edward J. DiDonato, Philadelphia, PA, for defendant REIG.

Joseph DiGiuseppe, Philadelphia, PA, for Sheriff.

Edward Sparkman, Philadelphia, PA, Standing Chapter 13, Trustee.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

## A. INTRODUCTION

The instant proceeding involves an action by MICHAELINE VALENTINE D'AL-FONSO ("the Debtor") to void a tax foreclosure sale ("the Sale") of real estate located at 767 South 9th Street, Philadelphia, Pennsylvania ("the Property"), conducted by the Defendant SHERIFF OF PHILADELPHIA (COUNTY) ("the Sheriff"), at which the buyer was Defendant REAL ESTATE INVESTMENT CORP. ("REIG"), mis-identified in the Complaint as A.R.E.I. Investment Corp. The Sale occurred post-petition, and the Debtor therefore alleges that it was conducted in violation of 11 U.S.C. § 362(a).

We find that the Debtor, as the heir of her late husband, has an ownership interest in the Property protected by the automatic stay, even though she failed to list it on her bankruptcy schedules. We reject all of the defenses, most prominently REIG's effort to qualify under the exception to the trustee's avoidance powers as set forth in 11 U.S.C. § 549(c), because we find that REIG has not met its burden of proving that it was a "good faith purchase" of the Property or paid "present fair equivalent value" therefor.

## B. PROCEDURAL AND FACTUAL HISTORY

On January 2, 1996, the Debtor filed her first bankruptcy case individually under Chapter 13 of the Bankruptcy Code, at Bankruptcy No. 96–10004 ("Case One"). However, she did not file the petition in the Philadelphia County Office for the Recorder of Deeds, nor notify the Sheriff of her filing. Furthermore, she failed to list the Property in her bankruptcy schedules, although she did include her residential real estate. The Debtor claimed that she did not list the Property because she believed that others also had ownership interests in it and that she was obliged to list only realty which she alone owned. The Debtor impressed us as totally unsophisticated in legal matters, and therefore she was credible in stating that her failure to include the Property was not an intentional effort to conceal the real estate from the bankruptcy trustee, but arose from a misunderstanding on her part.

Case One was dismissed on October 3, 1996. However, the Debtor filed a second individual bankruptcy case under Chapter 13 on November 11, 1996 ("Case Two"). The Debtor did not make any payments under her Case Two Chapter 13 plan as of the first

scheduled date of the confirmation hearing on May 8, 1997. The Standing Chapter 13 Trustee, Edward Sparkman ("the Trustee"), therefore filed a motion to dismiss the case ("the TMTD") on April 22, 1997, which was listed for a hearing on a continued confirmation hearing date of May 27, 1997. She claimed that she could not make the payments because she was unable to collect rents from the Property, had been her primary source of income, subsequent to the Sale.

The instant adversary proceeding ("the Proceeding") was filed on May 2, 1997, and listed for trial on June 4, 1997. However, the Debtor failed to defend the TMTD, and it was granted on May 27, 1997. The Debtor attempted to orally move to reinstate Case Two on the June 4, 1997, trial date, but we directed her to file a formal motion to accomplish this end, and a hearing on that motion was scheduled on a continued trial date of July 9, 1997.

On July 9, 1997, we granted the motion to reinstate the case, rescheduled a confirmation hearing on August 26, 1997, and conducted the trial. The Sheriff and REIG defended the Proceeding. At the conclusion of the trial, we accorded the parties until July 18, 1997, to file briefs. Only REIG rendered a submission.

At trial, the Debtor and her daughter testified as to the changes that occurred over the years in the familial ownership interests in the Property, which presently houses a restaurant and three apartment units. It was initially jointly owned by the Debtor's husband, Frank D'Alfonso ("Frank"), and his brother, the Debtor's brother-in-law, Albert D'Alfonso ("Albert"). Both have been deceased for many years. After Albert passed away, his interest in the Property was supposedly transferred to his wife, although the means of the transfer were never established. In the early 1960's, Frank allegedly bought out the interest of Albert's wife in the Property. Frank passed away in 1985 (assassinated by the Mafia, according to the Debtor's daughter), at which time the Debtor presumed that Frank had possessed full title to the Property. The Debtor claims that Frank's interest in the Property passed intestate to her upon Frank's death. While the Debtor did not produce any documentary evidence of her ownership interest, she testified that her tax returns, prepared by an accountant, indicated her ownership interest in the Property. However, the Debtor also testified that she believed that her children and possibly Albert's children have ownership interests in the Property as well.

From the time of Frank's death in 1985 until August 1997, the Debtor collected all of the rents from the tenants of the apartment building and the restaurant and used them for her support. The three apartments in the building generated approximately $250–$400 monthly, and the restaurant yielded about $1,500 monthly. These rents constituted the bulk of the Debtor's income. The Debtor claims that, after she stopped collecting rents in August 1996, the tenants of the Property agreed to put the rents in escrow. There was no indication that they did so and in fact the purchaser at the Sale stated that the rents were paid to him.

About one month after the Debtor filed Case One, on February 9, 1996, the City of Philadelphia ("the City") sent a notice of a forthcoming tax foreclosure sale of the Property to the record owners, the Debtor's late husband Frank and her late brother-in-law Albert. Although the Debtor claims to have never received notice of the sale and had no knowledge of it, she acknowledged her signature on certified receipts indicating apparent service of some notice of the Sale on two certified mail letters addressed to Frank and Albert, respectively. The receipt cards, but not the notices themselves, were offered and admitted into evidence.

On June 19, 1996, the Sale was conducted by the Sheriff. The co-partner of REIG, Franco DiGiacomo, was present at the sale, and testified that there were about five bidders who began the bidding at $40,000. REIG eventually presented the highest bid for the Property to the Sheriff, $80,075, paying $12,000 to the Sheriff at the time of the bid.

DiGiacomo testified that he believed that the Property was free of all encumbrances simply because the City was conducting the

sale. He further indicated that he was not an experienced tax sale purchaser and did not do a title search on the Property before purchasing it. DiGiacomo also testified that, at the time of the Sale, he did not know of the Debtor's pending Case One bankruptcy. However, he further testified that he found out about the Debtor's bankruptcy in late June or July of 1996 through a real estate agent, who apparently had some communications, the substance of which is unclear, with the Debtor's counsel. DiGiacomo further claims to have made several attempts to contact the Debtor after the sale to obtain more information about the pending bankruptcy. The Sheriff's deed to the Property was issued to REIG in January 1997 and, thus, REIG was aware of the Debtor's bankruptcy filing before it received the deed.

DiGiacomo also admitted that he knew the Debtor's family, and hence was aware that the record owners of the Property were deceased, but that he did not seek to investigate who actually had title to the Property. It was also brought out that DiGiacomo was quite aware that his brother-in-law operated the restaurant which was located at the Property and had paid rent to the Debtor for several months. He claimed, however, that he did not know the Debtor's exact interest in the Property at the time of the Sale.

DiGiacomo further testified that, subsequent to receiving the deed, he spent approximately $17,000 to repair the plumbing and air conditioning and for electrical work in the Property. To finance his purchase and those repairs, he allegedly borrowed money from Mellon Bank, which took a first mortgage on the Property in the amount of $100,000.

## C. DISCUSSION

REIG, in its post-trial submission, and the Sheriff, in its rather detailed Answer to the Complaint, raise several issues. The Sheriff argues that this court should exercise its discretionary abstention to avoid becoming involved in this matter; that 11 U.S.C. § 349 caused the automatic stay arising from the filing of Case One to become ineffectual; that the sale is protected by 11 U.S.C. § 549(c); and that, even if the stay from Case One could be effective, it should be annulled.

REIG concentrates on the efficacy of § 549(c), asserting annulment as a secondary alternative.

### 1. *Abstention Is Inappropriate.*

Discretionary abstention, pursuant to 28 U.S.C. § 1334(c)(1), requires, at bottom, " 'weighing the impact of the proceeding upon administration of the relevant bankruptcy case against the undesirability of a bankruptcy court's delving into unsettled issues of state law.' " *In re R.T. Opdenaker & Sons, Inc.,* 1996 WL 332403, at *5 (Bankr. E.D.Pa. June 11, 1996), quoting *In re Nutri/System, Inc.,* 1993 WL 525668, at *6 (Bankr.E.D.Pa. Dec. 15, 1993). Recovery of the Property and the income it generates is crucial to the successful administration of the Debtor's bankruptcy case. There are no unsettled state law issues raised by the instant controversy, as only federal bankruptcy law issues are in contest. We might add that the governmental body's interest in the instant single tax sale pales in comparison with the governmental interest in the general validity of local waste disposal flow-control ordinances at issue in *Opdenaker, supra. Compare id.* at *5–*6. Discretionary abstention would therefore be inappropriate. We note that the only case cited by the Sheriff in support of abstention, *In re Davis,* 177 B.R. 907, 913 (9th Cir. BAP 1995), merely remanded the matters at issue to the bankruptcy court to consider abstention in reversing a dismissal of a matter asserting a violation of the automatic stay on the ground that the cause was rendered moot by dismissal of the case.

We also note that, since the Proceeding seeks to undo the Sale as violative of the automatic stay, the Proceeding is core. *See In re James,* 120 B.R. 802, 809 (E.D.Pa. 1990), *rev'd on other grounds,* 940 F.2d 46 (3d Cir.1991); *In re Pocono Springs Co.,* 1997 WL 347906, at *7 (Bankr.E.D.Pa. June 18, 1997); and *In re B. Cohen & Sons Caterers, Inc.,* 97 B.R. 808, 813 (Bankr.E.D.Pa.), *aff'd in part & remanded in part,* 108 B.R. 482 (E.D.Pa.), *appeal dismissed,* 908 F.2d 961, 963 (3d Cir.1990), *clarified on remand,* 1990 WL 2632 (Bankr.E.D.Pa. Jan. 11, 1990), *aff'd,* 124 B.R. 642 (E.D.Pa.), *aff'd,* 944 F.2d

896 (3d Cir.1991). Mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) is therefore inapplicable, since the proceeding is not merely "related" to the Debtor's bankruptcy case. *See, e.g., In re West Coast Video Enterprises, Inc.,* 145 B.R. 484, 486 (Bankr. E.D.Pa.1992).

### 2. The Dismissal of Case One Does Not Preclude the Proceeding Pursuant to 11 U.S.C. § 349.

Section 349(b) of the Bankruptcy Code provides as follows:

(b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—

(1) reinstates—

(A) any proceeding or custodianship superseded under section 543 of this title;

(B) any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or preserved under section 510(c)(2), 522(i)(2), or 552 of this title; and

(C) any lien avoided under section 506(d) of this title:

(2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

 The statutory provisions under which proceedings or transfers are deemed reinstated or reversed by dismissal do not include § 362. Therefore, it is clear that dismissal of a case does not validate actions which constituted violations of the automatic stay during the pendency of that case. *See Davis, supra,* 177 B.R. at 911–12; *In re Lampkin,* 116 B.R. 450, 451–53 (Bankr. D.Md.1990); and *In re Sports & Science Ind., Inc.,* 95 B.R. 745 (Bankr.C.D.Cal.1989). We note that many courts implicitly agree with this principle in holding that the automatic stay arising in prior or different cases can be enforced by a debtor in a subsequent case. *See In re Schwartz,* 954 F.2d 569 (9th Cir.1992) (prior dismissed case); and *In re*

*Ward,* 837 F.2d 124, 125–26 (3d Cir.1988) (husband's prior case). Hence, § 349(b) does not provide that the violation of the Case One stay effected by the Sale is in any sense mollified by the dismissal of that case, and the Debtor may proceed to enforce that violation here in a proceeding instituted in Case Two.

### 3. The Defendants Have Failed to Prove that REIG Is a "Good Faith Purchaser" or Paid "Present Fair Equivalent Value" for the Property, such as Would Be Necessary to Utilize 11 U.S.C. § 549(c) to Overcome the Automatic Stay.

### (a) Section 549 May Not Be an Exemption to § 362(a).

Both Defendants direct most of their attention to arguments based upon 11 U.S.C. § 549(c). At the outset of our discussion of the application of § 549(c), we note that the interplay between § 549 and § 362 is critical to the issues to be determined by us. The purpose of the § 362(a) automatic stay has been described as

one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan or simply to be relieved of the financial pressures that drove him into bankruptcy.

*Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446, 448 (3d Cir.1982). *See also, e.g., In re Purnell,* 92 B.R. 625, 627 (Bankr.E.D.Pa.1988).

 The Third Circuit Court of Appeals has reiterated that actions taken in violation of the automatic stay under § 362(a) are null and void. *See Raymark Industries, Inc. v. Lai,* 973 F.2d 1125, 1132 (3d Cir.1992); *Maritime Electric Company, Inc. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir.1992); and *Ward, supra,* 837 F.2d at 126. Not only does § 362(a) stay *all* post-petition and pre-petition actions to obtain possession or exercise control over property of the estate, but also it is indeed *automatic* because it arises

irrespective of whether the parties stayed are aware that a petition has been filed or whether the debtor is aware that the stay halts a particular matter. *See Maritime Electric, supra,* 959 F.2d at 1204; and *In re Clark,* 69 B.R. 885, 889–90, *amended in part on other grounds on reconsideration,* 71 B.R. 747 (Bankr.E.D.Pa.1987).

The first issue presented is whether § 549(a), which reads as follows, is an exception to the principle that actions taken in violation of the stay are, in any instance, void:

> (a) Except as provided in subsection (b) [relating only to involuntary cases and hence inapplicable here] or (c) [*see* page 15 *infra*] of this section, the trustee may avoid a transfer of property of the estate—
>
> > (1) that occurs after the commencement of the case; and
> >
> > (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> >
> > (B) that is not authorized under this title or by the court.

The court, in *In re Servico, Inc.,* 144 B.R. 933, 936 (Bankr.S.D.Fla.1992),

> interprets § 549(a) to apply to postpetition transfers of property of the estate which are neither authorized, nor expressly prohibited. Accord [*Schwartz, supra,* 954 F.2d at 573–74; and *In re Garcia,* 109 B.R. 335, 338–39 (N.D.Ill.1989) ]. Under this interpretation, § 549(a) does not apply to transfers in violation of the automatic stay since this is a transfer which is expressly prohibited. However, § 549(a) still applies to, for example, transfers of property of the estate allegedly not in the "ordinary course of business," for purposes of 11 U.S.C. § 363(c)(1). This interpretation of § 549(a) is consistent with both § 362 and § 549(a).

There is something to be said for this position and, in a colloquy with REIG's counsel at trial, we articulated such a potential interpretation of § 549(a) as plausible. However, the weight of authority supports a view consistent with that expressed by Judge Fox of this court in the leading case interpreting § 549 in this jurisdiction, *Purnell, supra,* 92 B.R. at 628, as follows:

Although courts have noted that actions in violation of the automatic stay are void, they have also recognized that § 549(c) represents an exception to that principle. *See In re Ward* [, *supra* ]; *In re Stephen W. Grosse, P.C.,* 68 B.R. 847 (Bankr. E.D.Pa.1987).

*Accord, e.g., In re Shaw,* 157 B.R. 151, 153–54 (9th Cir. BAP 1993); *In re Williams,* 100 B.R. 726, 727 (Bankr.M.D.Pa.1989); *In re Powers,* 88 B.R. 294, 295–297 (Bankr.D.Nev. 1988); and *In re Edwards,* 5 B.R. 663, 665 (Bankr.M.D.Ala.1980).

(b) *REIG Has Not Proven That It Is a "Good Faith Purchaser" of the Property.*

■ If the *Servico* interpretation were found by us to be correct, we could stop here and rule in favor of the Debtor. However, we will assume, without deciding, that the majority position is correct. Nevertheless, the Defendants can proceed under § 549(a), even if it applies to violations of the automatic stay, only if they can fit the transfer within 11 U.S.C. § 549(c), which, provides as follows:

> The trustee may not avoid under subsection (a) of this section a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed where a transfer of such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such property . . . could not acquire an interest that is superior to the interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

Thus, § 549(c) provides an exception for good faith purchasers who (1) are ignorant of the debtor's bankruptcy; (2) pay present fair equivalent value for the property; and (3) perfect their title under applicable law so as

to defeat a subsequent bona fide purchaser before a notice or copy of the bankruptcy is filed with the appropriate authority. *See Ward*, 837 F.2d at 126. It is critical to note that § 549(c) creates a *very narrow* exception to the trustee's power of avoidance. *Purnell, supra*, 92 B.R. at 629–31.

Before commencing our analysis under § 549(c), we note several preliminary matters. First, consistent with the *Servico* interpretation of § 549 as a whole is the legislative history of § 549(c), which provides that

> [t]he purpose of § 549(c) is to protect against a fraudulent debtor selling real property to an innocent purchaser who has no knowledge of the bankruptcy case. 4 COLLIER ON BANKRUPTCY, ¶ 549.03[3], at 549–12, 549–13 (Lawrence P. King, ed., 15th ed.1992).

*In re Briglevich*, 147 B.R. 1015, 1020 (Bankr. N.D.Ga.1992). *Accord, Purnell, supra*, 92 B.R. at 629, citing H.R. REP. NO. 93–137, 93rd Cong., 1st *Sess.*, Part II 162–64 (1973). Clearly, the instant Sale does not fit within this paradigm; the Debtor did not voluntarily sell the Property.

Second, it is clear that the Defendants have the burden of proving every element of § 549(c) if they wish to sustain the validity of the transfer. Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 6001 expressly so provides.

Third, we will briefly address the issue of the Debtor's interest in the Property at issue. This issue was raised at the trial, but was not raised in the pleadings nor argued by REIG in its brief. Hence, although the issue is apparently not contested, we will lay it to rest.

It was established at trial that the Property was titled in the names of Frank and Albert, and not that of the Debtor. However, Frank died intestate in 1985. The Debtor is clearly an heir of Frank, entitled to the first $30,000 and one-half of the balance of his estate. 20 Pa.C.S. § 2102(3).

 The law of Pennsylvania states that, upon the death of an intestate, title to real property immediately descends to his heirs. *See Blank v. Clark*, 79 F.Supp. 373, 376–77 (E.D.Pa.1948); *In re Graves*, 142 B.R.

115, 119 (Bankr.E.D.Pa.1992) ("*Graves II*"), aff'd, 156 B.R. 949 (E.D.Pa.1993) ("*Graves II*"), aff'd, 33 F.3d 242 (3d Cir.1994) ("*Graves III*"); and *In re Evans*, 120 B.R. 817, 819 (Bankr.E.D.Pa.1990). Thus, upon Frank's death in 1985, the Debtor acquired a legal interest in the Property. It appears that the other heirs of both Frank and Albert were content to allow the Debtor to have full and complete use of the Property. In any event, the Debtor's legal interest in the Property, although probably not full and complete, is quite sufficient to render that interest "property of the estate" of the Debtor, *see* 11 U.S.C. § 541(a)(1), protected by the automatic stay. The Debtor's failure to list the Property in her schedules does not affect the operation of the automatic stay as to it. *See Clark, supra*, 69 B.R. at 889–90.

Assuming *arguendo* that § 549 and thus § 549(c) applies, the Defendants have the burden of proving that REIG was "a good faith purchaser" of the Property, was "without knowledge of the commencement" of Case One, and that its bid was "for present fair equivalent value" of the Property. It is clear that the Debtor did not at any time file a copy of the Case One petition with the Recorder of Deeds, where a transfer of the Property may have been recorded.

 At the outset, we note that "good faith purchaser" status is an element apart from the purchaser's knowledge of the commencement of a relevant bankruptcy case. This issue depends upon the purchaser's notice regarding competing ownership interests in real property, which is the critical element in establishing the status of a good faith purchaser generally. It is well settled that, when a purchaser buys real property *with* knowledge of an unrecorded interest, the purchaser's interest is subject to that unrecorded interest holder. *E.g., Graves III, supra*, 33 F.3d at 252.

 Under Pennsylvania law, either actual or constructive notice is sufficient to prevent a subsequent purchaser from acquiring the status of a bona fide purchaser. *See id.;* and *Long John Silver's, Inc. v. Fiore*, 255 Pa.Super. 183, 190, 386 A.2d 569, 573 (1978). Moreover, where a purchaser has

constructive notice of the existence of a possessor, he is required to investigate whether the possessor claims to have any legal or equitable interest in the property, even if the possessor failed to record such interest. *See Graves II, supra*, 156 B.R. at 957.

The Defendants argue that they had no notice of the Debtor's ownership of the Property, focusing on the Debtor's failure to advise the Sheriff of her bankruptcy filing or to include the Property in her bankruptcy schedules. In response, we reiterate that good faith purchaser status here can be analyzed apart from knowledge of the bankruptcy filing.

Furthermore, we note that the instant facts provide some reason for the Debtor not to have advised the Sheriff of her filing. She credibly testified that she was unaware that the Property was scheduled for sale. The only evidence to rebut this testimony is the Debtor's signature on mail receipts sent to Frank and Albert. Thus, the Defendants argue that the Debtor should have known about the Sale, and the only reason she did not know about it was due to her failure to properly record the title to the Property. This argument has some force and points out that the Debtor is not without fault in this scenario, although it is difficult to measure its total force in light of the absence of a copy of the notice itself from the record.

However, we fail to see what motivation the Debtor might have had not to inform the Sheriff that her bankruptcy stayed the Sale if she knew about it. Moreover, the Debtor's own knowledge of the Sale is not the critical issue; rather, it is whether REIG knew or should have known whether the Sale was conducted "without regard to [the Debtor's] interest" in the Property. *See Graves III supra*, 33 F.3d at 251 (court finds sale purchaser was not a "bona fide purchaser" despite its also finding that the debtor received notice of the sale).

We believe that there existed sufficient facts to establish that REIG had constructive notice of the Debtor's ownership interest in the Property prior to the Sale and that the Sale was conducted without regard for that interest. DiGiacomo admitted that he knew the Debtor's family and that the record owners of the Property, Frank and Albert, were deceased. He also knew that his brother-in-law operated the restaurant on the Property and made rental payments to the Debtor. DiGiacomo's knowledge that the Debtor was the widow of a co-record owner and was responsible for collecting rents from the Property should have clearly been sufficient to raise a red flag in his mind that the Debtor very likely had some ownership interest in the Property and that the Sale was conducted without regard to that interest. DiGiacomo claimed that he did not know for certain what interest the Debtor had in the Property. However, we believe that a reasonably prudent person in DiGiacomo's position had been put on notice of a strong likelihood of a potentially significant interest of the Debtor in the Property.

Moreover, it is the duty of the subsequent purchaser to ask about the rights of the possessor, and *not* the duty of the possessor to disclose those rights to the purchaser. *Graves II, supra*, 156 B.R. at 957. Thus, at a minimum, REIG had a duty to inquire about the Debtor's rights in the Property. We observe that, prior to the Sale, REIG made no attempt to contact the Debtor regarding her possible ownership interests therein. Since the status of a good faith purchaser depends on whether the purchaser had notice *prior* to the sale, we believe that the purchaser's duty to inquire similarly arises in the period of time before the sale occurs.

Thus, we conclude that REIG had constructive notice of the Debtor's interest prior to the sale but failed to make reasonable further inquiry at that time. it therefore failed to fulfill its duty to inquire about the Debtor's rights in the Property. In light of the foregoing evidence, we conclude that REIG cannot be accorded the status of a good faith purchaser under § 549(c).

We emphasize that we reach this conclusion without considering the impact of the Debtor's Case One bankruptcy filing and hence without considering the separate element of REIG's knowledge of the commencement of that case. However, we note that, had it investigated the Debtor's status fur-

ther, REIG is likely to have discovered the Debtor's bankruptcy filing as well. However, as in *Graves, III, supra,* the instant facts establish that, apart from the bankruptcy filing, REIG is not a good faith purchaser.

■■■■ REIG's status as a good faith purchaser was further undermined by its conduct between the time of the Sale and the delivery of the deed to it in January 1997. DiGiacomo admitted that he heard of the Debtor's bankruptcy in late June or early July 1996, very shortly after the Sale. It is well-established that "knowledge of the bankruptcy filing is the legal equivalent of knowledge of the stay." *In re Wagner,* 74 B.R. 898, 904 (Bankr.E.D.Pa.1987). Nevertheless, REIG proceeded to consummate the sale even after it became fully knowledgeable about the Case One bankruptcy.

In its post-trial brief, REIG argues that the record establishes that the Debtor's counsel failed to provide requested notification of the filing of Case One. We find no such evidence in the record. All we know is that communications occurred. Certainly, these communications were sufficient to put REIG on notice that a bankruptcy did exist; a stay arose as to the Debtor's property; and, as DiGiacomo knew all along, the Debtor very likely had an interest in the Property which the stay affected. REIG was privy to this information, no matter what the Debtor's counsel said, and there is no evidence that counsel provided any misleading information. If DiGiacomo is correct that it had no knowledge of the Debtor's bankruptcy, it is difficult to understand how the Debtor's omission of the Property from her schedules could have been significant to REIG. Certainly, DiGiacomo provided no evidence that this omission misled him.

It is unfortunate that REIG has invested considerable sums in the Property. However, this was clearly done after DiGiacomo was aware of the commencement of Case One prior to the Sale and he clearly should have known of the Sale's invalidity.

(c) *REIG Did Not Prove That It Paid "Present Fair Equivalent Value" for the Property.*

Although REIG's lack of "good faith purchaser" status invalidates the Sale, irrespec-

tive of any conclusion we reach on the issue of its "knowledge" of the commencement of Case One, we will further address the "present fair equivalent value" requirement of § 549(c). Both the Bankruptcy Code and the legislative history are silent as to the meaning of this term, and two distinct interpretations as to the meaning of "present fair equivalent value" appear to have emerged. In any event, it is clear that the Defendants had the burden of proving this element, per F.R.B.P. 6001. We note that there was no evidence whatsoever, lay or expert, presented regarding the value of the Property. This fact alone may be sufficient to support the conclusion that the Defendants have failed to meet this burden.

However, proceeding further, we note that most courts, and in particular Judge Fox of this court in *Purnell, supra,* recognize that the automatic stay can be overcome only in extraordinary circumstances, and have thus held that the term "present fair equivalent value" means payment which amounts to the actual value of the realty. 92 B.R. at 629–31. Specifically, *Purnell, id.* at 630 n. 3, rejects a mortgagee's claim that: its own credit-bid purchase of a property at a sheriff sale satisfies § 549(c), irrespective of the fact that such a bid might well have satisfied the requirements of 11 U.S.C. § 548(a)(2). *Compare, e.g., In re Cole,* 81 B.R. 326, 329–31 (Bankr.E.D.Pa.1988); and *In re Brunell,* 47 B.R. 830, 831 (Bankr.E.D.Pa.), *aff'd,* 76 B.R. 64 (E.D.Pa.1985). Most other courts concur. *See Shaw, supra,* 157 B.R. at 152–54; *In re Auxano, Inc.,* 96 B.R. 957, 962–64 (Bankr. W.D.Mo.1989); and *Powers, supra,* 88 B.R. at 296–97.

A few courts appear, to the contrary, to have applied the basic proposition stated by the Court in *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994), in applying § 548(a)(2), *i.e.,* that "a fair and proper price or a 'reasonable equivalent value' for foreclosed property is the price in fact received at the foreclosure sale, so long as all of the requirements of the State's foreclosure law have been complied with." On this point, REIG

relies heavily upon the decision in *In re T.F. Stone Co.*, 72 F.3d 466 (5th Cir.1995), which specifically held that the price obtained at a non-collusive tax sale, in conformity with state law, satisfied the § 549(c) requirement that the sale be effected for present fair equivalent value. *See also In re McDonald*, 210 B.R. 648, 650–51 (Bankr.S.D.Fla.1997); and *In re Bago*, 149 B.R. 610, 614 (Bankr. C.D.Cal.1993).

We make several observations regarding the *Stone* case. First, *Stone* did not involve a sale which the debtors argued was conducted in violation of § 362(a). The tax sale in issue resulted from tax deficiencies which arose postpetition and hence were not claims which arose before the commencement of that bankruptcy case. 72 F.3d at 470. Therefore, in *Stone*, there was no clash between § 362 and § 549 at issue which would support a narrower reading of § 549(c) than might otherwise be justified. Second, the debtor re-acquired the property from the tax sale purchaser. *Id.* at 468. It was left only in the rather unattractive posture of maintaining a suit to recover the value of the property paid by it from the local taxing authority. *Id.*

We also are inclined to take particular note of the Court's statement in *BFP* that its holding applies to *"only* mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy *tax liens,* for example) may be different." 511 U.S. at 537 n. 3, 114 S.Ct. at 1761 n. 3 (emphasis added). We are unwilling, unlike the *Stone* court, to extend the narrow holding in *BFP* beyond mortgage foreclosures to include tax foreclosure sales, as in the present case.

We further make note of certain aspects of the cases consistent with *Stone* which may lessen their significance. The *Bago* holding has been effectively overruled by the later appellate decision in *Shaw, supra.* The *McDonald* court's result is offset by the very different reasoning of the *Servico* court, *see* page 514 *supra,* decided by another bankruptcy judge in the same district.

■ We therefore conclude that the reasoning of *BFP* that the price received at a non-collusive sheriff's sale is "reasonably

equivalent value" under § 548(a)(2) cannot be transposed to the definition of "present fair equivalent value" in § 549(c), particularly when to do so would undermine the application of the automatic stay. The Defendants' failure to establish that the bid price of $80,075 was anything close to the "present fair equivalent value" of the Property is therefore fatal to their attempt to invoke § 549(c).

4. *The Automatic Stay Arising From Case One Will Not Be Annulled to Validate the Sale.*

Finally, both Defendants assert, but without much vigor, that, if the Sale were found to be avoidable by the Debtor, this court should annul the automatic stay as a means of validating the otherwise void sale. In making this argument, the Defendants are confronted with this court's following declarations regarding the relief of annulment of the stay in *In re Siciliano*, 167 B.R. 999, 1007–08 (Bankr.E.D.Pa.1994):

This relief is quite extraordinary because it is retroactive, and, therefore, parties who secure such relief will have their previous actions, which may have violated the automatic stay at the time, validated after the fact. Annulling the stay is thus inconsistent with the notion that all debtors who seek the protection of bankruptcy in good faith are entitled to the "breathing spell" created by the automatic stay. Such extraordinary relief should therefore not be commonly available. If it were otherwise, the careful balance of benefits and burdens built into the Bankruptcy Code by Congress would be thrown off kilter.

. . . . .

A scenario which has been found particularly conclusive to stay annulment is when the debtor either encourages a creditor to proceed notwithstanding the stay or lies in wait for the outcome of an action by one of its creditors and only asserts its status as a bankruptcy debtor after an unsatisfactory outcome becomes known. *See, e.g., [In re] Pinetree, [Ltd.,] supra,* 876 F.2d [34,] at 37 [ (5th Cir.1989) ] (stay annulled when debtor notified of foreclosure in advance and failed to assert its

status as a bankruptcy debtor); *[In re] Williams, supra,* 124 B.R. [311,] at 316 [ (Bankr.C.D.Cal.1991) ] (stay will be annulled in the case of the " 'stealthily silent' debtor who continues actively to defend lawsuits, sometimes for years after filing a bankruptcy petition, without informing other parties or the court about the bankruptcy case until an adverse judgment is imminent"); *In re Oliver,* 38 B.R. 245, 248 (Bankr.D.Minn.1984) (stay annulled where the debtor took no steps to enforce the automatic stay until after creditor had advertised the foreclosed property and sold it at a sheriff's sale).

Consistent with our pronouncements in *Siciliano* are those of the court in *In re Soares,* 107 F.3d 969 (1st Cir.1997). *Soares, id.* at 977, states regarding efforts to utilize stay annulment to revitalize foreclosure sales conducted in violation of the automatic stay, that

the overarching purpose of the automatic stay informs our analysis. Because the stay is a fundamental protection for all parties affected by the filing of a petition in bankruptcy, it should not be dismantled without good reason. *See, e.g., Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir.1986). Undoing the stay retroactively should require a measurably greater showing. Congress intended the stay to afford debtors breathing room and to assure creditors of equitable distribution. *See* H.R.Rep. No. 95–595, *supra,* at 340, 1978 U.S.C.C.A.N. at 6296–97. If retroactive relief becomes commonplace, creditors—anticipating *post facto* validation—will be tempted to pursue claims against bankrupts heedless of the stay, leaving debtors with no choice but to defend for fear that post-petition default judgments routinely may be resuscitated.

We believe that Congress created the automatic stay to ward off scenarios of this sort. Thus, if congressional intent is to be honored and the integrity of the automatic stay preserved, retroactive relief should be

the long-odds exception, not the general rule.

. . . . .

In our view, only a strict standard will ensure the accomplishment of these objectives. *See [In re] Albany Partners, [Ltd.,]* 749 F.2d [670,] at 675 [ (11th Cir.1984) ] (explaining that "the important congressional policy behind the automatic stay demands that courts be especially hesitant to validate acts committed during the pendency of the stay"). We conclude, therefore, that although courts possess a limited discretion to grant retroactive relief from the automatic stay, instances in which the exercise of that discretion is justified are likely to be few and far between.

▮▮ REIG contends that the instant Debtor "intentionally" failed to notify the Sheriff or the Recorder of Deeds concerning her bankruptcy filing; failed to respond to REIG's inquiries regarding her bankruptcy filing; and "perjured herself" by "intentionally" failing to list the Property on her bankruptcy schedules. These recitations are obvious overstatements regarding the culpability of the Debtor. We find that she failed to notify the Sheriff and Recorder of Deeds because she was unaware of the Sale and the efficacy of doing so, not out of malice or any intent to mislead REIG or engage in self-destruction. There is no evidence that she or her counsel failed to respond to inquiries and thereby misled REIG or her agents, although we cannot commend the delay of the Debtor's counsel in asserting the claims raised in the Proceeding. We find the omission of the Property from the schedules to be an error which has been discovered before it resulted in prejudice to the Debtor's creditors.[1] The Debtor has in no sense been found to have encouraged DiGiacomo/REIG to have bought the Property and improved it before asserting her claims, nor to have lay in wait for the outcome of any matter before asserting her interests.

---

1. We note, for the edification of the Trustee and the creditors, that the Debtor testified that she likely had an interest in a third property, which was also omitted from her schedules, located at

817 South 9 th Street, two doors from her residence. This realty is apparently titled to Frank's long-deceased parents.

■ REIG also contends that it is "impossible" to undo the instant sale at this juncture. It argues that, as the court found in *In re Formisano*, 148 B.R. 217 (Bankr. D.N.J.1992), in ruling favorably on the purchaser's right to a lien pursuant to the last sentence of § 549(c), we might as well allow the sale to stand even though it is void. We disagree. Since neither the pleading nor the record address the practical consequences of the relief which we must grant, *i.e.*, avoiding the sale, or the consequences thereof, we are not prepared to render any decision on any such issues at present. We note that REIG's lack of "good faith purchaser" status appears to eliminate any claims of a lien on its part.

## D. CONCLUSION

In light of the foregoing, we will simply enter an Order voiding the sale and scheduling a status hearing in the Proceeding to discuss any consequences which must be resolved prior to confirmation of any Chapter 13 plan at the rescheduled confirmation hearing in the Debtor's main bankruptcy case on August 26, 1997. We encourage the parties to attempt to negotiate a practical resolution of these issues prior to that date.