In re Wane C. GLENDENNING,
Debtor.

Wane C. Glendenning, Plaintiff,

v.

Third Federal Savings Bank, Don Marshall, Esquire, Sheriff of Bucks County, Craig T. Edwards, Esquire, 541 Church Hill Road Trust, Defendants,

v.

Michael Bowen, Esquire Commonwealth of Pennsylvania, Department of Revenue, Township of Nockamixon Palisades School District, All Other Parties to Whom the Sheriff of Bucks County Did Make Distribution of Funds, Upon Having Sold Parcel No. 30–7–7; Additional Defendants.

Bankruptcy No. 99–19601DAS.
Adversary No. 99–0897.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Jan. 20, 2000.

Michael G. Bowen, Doylestown, PA, for Debtor and Third–Party Defendant.

Thomas J. Walsh, III, Newtown, PA, for Third Federal Savings Bank and Marshall.

Ronald L. Clever, Allentown, PA, for 541 Church Hill Road Trust.

Craig T. Edwards, Quakertown, PA, Pro Se.

Frederic Baker, Philadelphia, PA, Ass't U.S. Trustee.

*OPINION*

DAVID A. SCHOLL, Bankruptcy Judge.

A. *INTRODUCTION*

The instant adversary proceeding ("the Proceeding") and related motions arising in the main bankruptcy case of WANE C. GLENDENNING ("the Debtor") raise issues similar to those decided by us in *In re D'Alfonso*, 211 B.R. 508 (Bankr.E.D.Pa. 1997), wherein we set aside a judicial sale conducted in violation of the automatic stay despite the assertion of the status of a

"good faith purchaser" under 11 U.S.C. § 549(c) by the purchaser at that sale. Believing, as we do in the absence of evidence to the contrary on most points, the testimony of the Debtor and his counsel that they gave pre-sale notice of the bankruptcy filing to, respectively, the purchaser and the judgment creditor's counsel and the Sheriff, we find the facts in favor of setting aside the sale stronger, if anything, here than in *D'Alfonso*. As in *D'Alfonso*, however, we will refrain from deciding the issue of the consequences of our decision until the parties have an opportunity to consider same and attempt to work matters out among themselves.

## B. PROCEDURAL AND FACTUAL HISTORY.

On April 22, 1999, the Debtor filed Bankruptcy Case No. 99–15270DAS, the fourth of five Chapter 13 bankruptcy cases initiated by him since December 4, 1997 ("the Fourth Case"). The purpose of the Fourth Case filing, like those before it, was to prevent the Sheriff Sale of the Debtor's home, built in 1790 and known as 541 Church Hill Road, Ferndale, Bucks County, PA. ("the Home"), which was then scheduled on May 14, 1999.

The law office of the Debtor's counsel, third-party defendant MICHAEL G. BOWEN, ESQUIRE ("Bowen"), is in his home. Bowen's daughter Heidi ("Heidi"), a recent college graduate who has periodically worked part-time as one of her father's assistants for several years, testified in a deposition admitted into evidence at the request of opposing counsel that, on the day of the bankruptcy filing, she called the office of defendant SHERIFF OF BUCKS COUNTY ("the Sheriff") and the office of defendant DON MARSHALL, ESQUIRE ("Marshall"), counsel for the judgment creditor at the sale, defendant THIRD FEDERAL SAVINGS BANK ("the Bank"), and informed the parties who answered the phone calls of the filing. Heidi also testified that she informed Marshall's office that a copy of the petition would be faxed to Marshall shortly thereafter.

Bowen testified that, on April 23, 1999, he sent a copy of the cover page of the Fourth Case petition and a covering letter to Marshall by fax and by letter. Copies of these documents were produced as exhibits at trial.

The Debtor testified that, on May 7, 1999, confident that the sale was stayed, he made a mortgage payment of $729.00 to the Bank. The Bank admittedly cashed this check and has not refunded the amount paid.

In early May defendant CRAIG T. EDWARDS, ESQUIRE ("Edwards"), on behalf of a firm which frequently purchases properties listed for sheriff's sales, visited the Home in his survey of properties remaining listed for the forthcoming Bucks County sheriff's sale. Edwards testified that he met the Debtor at the Home and asked and received permission to view the exterior of the Home. The Debtor states that he gave such permission but advised Edwards that the sheriff's sale of the Home was stayed by the filing of the Fourth Case. Edwards vigorously denied receiving any advice of this bankruptcy filing in this exchange or otherwise.

Marshall denied receipt of any communication regarding the filing of the Fourth Case. Consequently, the sheriff's sale of May 14, 1999 ("the Sale"), was not stayed. After some competitive bidding between the Bank and Edwards and perhaps others, Edwards purchased the Home at the Sale for $87,300.

The Fourth Case was dismissed on June 22, 1999, when the Debtor failed to attend the meeting of creditors. No explanation as to why or how the Debtor failed to meet this commitment was presented. *But see In re Arena*, 81 B.R. 851 (Bankr.E.D.Pa. 1988) (burden of proof is on any party asserting that such a basis for dismissal fits with 11 U.S.C. § 109(g)). After making a distribution of $80,086.57 to the Bank and in various other small amounts to sev-

eral third-party defendant taxing authorities, the Sheriff issued a deed of the Home to Edwards' assignee, defendant 541 CHURCH HILL ROAD TRUST ("the Trust"), on July 2, 1999.

The instant bankruptcy case was filed on July 29, 1999, to Stay the Trust's attempt to evict the Debtor from the Home. On August 20, 1999, Edwards filed a motion for relief from the automatic stay, to which Bowen, on behalf of the Debtor, filed an answer. On the hearing date of September 16, 1999, which we note was a day of very heavy rains and floods in certain local areas from the effects of a hurricane, only the Trust and Edwards appeared. Bowen now attributes his failure to appear to these weather conditions. On the following day, September 17, 1999, we entered our Order ("the 9/17 Order") providing that

> the automatic stay shall remain in effect only if the Debtor (1) on or before September 30, 1999, files and appropriate serves on all parties defendant and the court in chambers, and lists for a trial, on November 4, 1999, an adversary proceeding seeking to invalidate [the Sale] ...; (2) thereafter successfully litigates that proceeding and avoids the Sale of the Premises; and (3) ultimately obtains his discharge in this case. If any of the foregoing conditions are not met, the Motion [for relief from the automatic stay] will in all probability be granted forthwith.

The Proceeding was filed in response to this order on September 30, 1999 ("the 9/30 Order"), although it was erroneously initially listed for trial on November 16, 1999, instead of November 4, 1999. On November 5, 1999, the Trust, as third-party plaintiff, filed a Complaint joining Bowen and the distributees after the sale as third-party defendants.

The trial of the Proceeding was ultimately continued by agreement until December 22, 1999. On November 10, 1999, the Trust filed (1) a motion "for a final order under § 362" ("the Renewed Stay Relief Motion"), claiming that the Debtor had failed to make payments to the Chapter 13 trustee or to appear for a scheduled deposition, properly serve it, or obtain a discharge, and therefore it should be entitled to the relief conditioned in the 9/30 Order; and (2) a motion seeking to dismiss the case or convert it to a Chapter 7 case ("the Dismissal Motion") on essentially the same grounds. On November 19, 1999, the Bank filed a motion seeking to annul the automatic stay to validate the Sale ("the Annulment Motion"). The hearings on the Renewed Stay Relief Motion, the Dismissal Motion, and the Annulment Motion were all ultimately consolidated with the trial of the Proceeding on December 22, 1999.

At the close of the trial/hearing, the Bank's counsel requested two weeks to file a post-trial brief. We allowed all of the parties until January 6, 2000, to file opening briefs and until January 13, 2000, to file reply briefs. The Debtor, the Trust, the Bank, and Edwards filed opening briefs, but only the latter two parties availed themselves of their opportunity to file reply briefs.

Relevant testimony not already referenced herein which emanated from the Debtor included his statement that he purchased the Home for $48,500 in 1974 with his wife Helen, from whom he has been separated for the most part for several years, but who on the trial date resided at the Home. The Debtor made the underlying loan from the Bank in 1989 after the original Home mortgage was paid off to finance the Debtor's landscaping business. Unfortunately, in 1991 the Debtor seriously injured his back and has been disabled since, and apparently lost his business.

Also living in the Home is the Debtor's youngest child, a 22–year–old daughter who is confined to a wheelchair, indefinitely and perhaps permanently, due to complications arising from a recent pregnancy. The Debtor's present monthly income consists of Social Security disability benefits of $729, wages from part-time light car-

pentry work of $600 to $1000, and rent of about $700 from two tenants in the Home.

The Debtor valued the Home at $170,000, noting that it had been repaired with the proceeds of a $15,000 rehabilitation loan made two years before. The Schedules list the value of the Home as $149,000. The Home is assessed at $166,000.

Edwards testified that the Home is in poor condition and in his opinion is actually worth approximately $120,000. However, he did not deny that he proposed renting the Home to the Debtor for $1660 monthly, because that figure was one (1%) percent of the Home's assessed value, which appears to attach particular significance to that figure.

## C. DISCUSSION

Many of the most difficult legal issues presented by these matters were addressed and decided in *D'Alfonso.* Therein, we held that a proceeding seeking to undo a sheriff's sale held in violation of the automatic stay arising in a prior bankruptcy case is a core proceeding when initiated in the context of a subsequent bankruptcy case. 211 B.R. at 512–13.

We noted the conflict between 11 U.S.C § 362(a) which voids post-petition judicial actions taken without relief from the automatic stay; and 11 U.S.C. § 549(c), which protects a post-petition property transfer to "a good faith purchaser without knowledge of the commencement of the [bankruptcy] case ... for present fair equivalent value." 211 B.R. at 513–15. There, we "assume[d], without deciding," *id.* at 514, that the majority position that § 549(c) trumps § 362(a) was correct. Since that decision, we cited, in the 9/17 Order, a decision following the majority position, *In re Fulmer–Vaught,* 218 B.R. 56, 58 (Bankr. W.D.Mo.1998), and a decision following the minority position that § 549(c) is not in any case an exception to § 362(a), *In re Smith,* 224 B.R. 44, 47 (Bankr.E.D.Mich. 1998).

In *D'Alfonso* we held that, assuming the application of § 549(c), the judicial sale purchaser could not successfully assert § 549(c) "good faith purchaser" status because (1) he was aware of facts which should have led him to conclude that the debtor, although the owner of the property sold, may not have received notice of the sale. 211 B.R. at 514–17; and (2) he failed to prove that his competitive bid of $80,075 was the "present fair equivalent value" of the property sold.

█ Upon further consideration of the issue regarding the relationship of §§ 362(a) and 549(c) which we expressly refused to resolve in *D'Alfonso,* we now believe that the minority position articulately expressed in *Smith,* citing *In re Servico, Inc.,* 144 B.R. 933, 936 (Bankr. S.D.Fla.1992), is the more persuasive. It provides a bright-line test because sales in violation of the automatic stay will then, in almost every case, be invalidated, without weighing the difficult factual issues often arising from consideration of § 549(c). We find very persuasive the following reasoning of Judge Rhodes in *Smith,* 224 B.R. at 47–48, which of course was rendered after our decision in *D'Alfonso:*

> In *In re Schwartz,* 954 F.2d 569 (9th Cir.1992), in attempting to reconcile the possible conflict between § 362 and § 549, the court stated:
>
> "[A] straightforward analysis of section 549 reveals that it is not intended to cover the same type of actions prohibited by the automatic stay nor rendered moot by section 362's voiding of all automatic stay violations. Section 549 applies to unauthorized transfers of estate property which are not otherwise prohibited by the Code. In most circumstances, section 549 applies to transfers in which the debtor is a willing participant. . . .
>
> Section 362's automatic stay does not apply to sales or transfers of property initiated by the debtor. Thus, section 549 has a purpose in bankruptcy beyond the potential overlap with

section 362. In other words, the automatic stay can void any violation and still leave section 549 with a valid and important role in bankruptcy. Section 549 exists as a protection for creditors against unauthorized debtor transfers of estate property."

*Id.* at 573–74 (citations omitted).

A number of cases have held that § 549(c) does provide an exception to § 362(s). *See In re Taylor,* 884 F.2d 478 (9th Cir.1989); *In re Carpio,* 213 B.R. 744 (Bankr.W.D.Mo.1997); *In re D'Alfonso,* 211 B.R. 508 (Bankr.E.D.Pa. 1997);[1] *In re Hill,* 156 B.R. 998 (Bankr. N.D.Ill.1993). However, these cases are inconsistent with the plain language of the §§ 362(a) and 549. Further, this line of cases is inconsistent with the Sixth Circuit's holding in *Easley [v. Pettibone Michigan Corp.,* 990 F.2d 905 (6th Cir.1993) ].

Finally, the Court's holding is consistent with the purpose of both § 362(a) and § 549(c):

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296–97.

Section 549(c) is intended to protect against a fraudulent debtor selling real property to an innocent purchaser who has no knowledge of the pendency of the bankruptcy case. 5 Collier on Bankruptcy ¶ 549.06, at 549–11 (Lawrence P. King ed., 15th ed.1997).

Also weighing on our decision is the principle that, because it protects all creditors as well as the debtor, the automatic stay arises even in the face of the debtor's own dereliction in raising it. *See In re Clark,* 69 B.R. 885, 889–90, *modified on other grounds* 71 B.R. 747 (Bankr.E.D.Pa.1987).

This decision that § 549(c) is not an exception to § 362(a) is sufficient in itself to invalidate the Sale, which is then subject to a declaration that it is void as consummated in violation of § 362(a). Nevertheless, although not necessary to our disposition to do so, we will indicate why, on alternative grounds, neither § 549(c) nor any other defense raised by the defendants can stand to validate the Sale.

Assuming *arguendo,* as we did in *D'Alfonso,* that the majority position that § 549(c) is an exception to § 362(a) is correct, the result here is clearer, if anything, here than was the result applying § 549(c) in *D'Alfonso.* In *D'Alfonso* the sale purchaser indisputably had no prior notice of the debtor's bankruptcy filing, 211 B.R. at 512. Nor was it alleged that the debtor had attempted to provide pre-sale notice of her bankruptcy filing to the attention of either the official conducting the sale or the judgment creditor. In fact, the property sold was not even listed as an asset by the debtor on her bankruptcy schedules. *Id.* at 510.

The *D'Alfonso* debtor justified her failure to provide notice of her filing to any party prior to the sale because she claimed to have been unaware of the sale, although this assertion was weakened by evidence that she personally had signed for certified mail notice of the sale. *Id.* at 511. Her omission of the property at issue from her Schedules was justified by her contention that she believed that only property which she owned alone should be listed. *Id.* at 510. These justifications, even if true, were of course of little help to the purchas-

---

**1.** Since we expressly did not decide this issue in *D'Alfonso,* we cannot agree with this cita- tion.

er in garnering knowledge of the sale which would destroy his good faith purchaser status.

No evidence of the value of the *D'Alfonso* property sold appears in the Opinion. We nevertheless held that the lack of affirmative evidence of "fair present equivalent value" undermined the purchaser's status as a purchaser for such value in that case. 211 B.R. at 517–18.

Here, meanwhile, there is clear evidence of pre-sale notification of the bankruptcy filing itself to the Sheriff and the Bank by Heidi and Bowen, and to the purchaser, Edwards, by the Debtor. The Defendants appear to recognize this fact and their only real responses are attacks on the credibility of Bowen and the Debtor. Bowen is accused, explicitly by the Trust's counsel and explicitly by the others, of manufacturing the copy of the fax and letter sent to Marshall which were presented into evidence at the trial. As we pointed out at trial, this is a very serious charge and one which we would be unlikely to sustain without a very clear basis to do so. However, we find that Bowen and the Debtor were both credible witnesses.

Although Heidi was not present at trial, her deposition was offered by the Trust and admitted into evidence, apparently on the belief that it rebutted Bowen's testimony, pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7032 and Federal Rule of Civil Procedure ("F.R.Civ.P.") 32(a)(1). The fact that we find the deposition to support rather than contradict Bowen's testimony does not affect the fact that the deposition was properly offered and admitted into evidence. In light of these developments, it is difficult to understand the argument of the Trust that an inference could somehow be drawn against the Debtor because Heidi was not present at trial. The Trust itself made her deposition testimony part of the record.

Edwards utilizes his status as a party to reiterate, in his briefs, his testimony that the Debtor never informed him about his pending bankruptcy case. We initially observe that, in believing one version of a two-party conversation not overheard by any other person over another, we are not designating the party whose version we do not accept as a rogue or a liar. It is our experience that different parties to a conversation remember different things about what was said because they tend to recall what was most important to them. For this reason, they may have not listened to or not heard parts of a conversation which were made and are recalled only by the other. Therefore, their truthful testimony that they recall no such statements having been made is not conclusive.

We believe that it is more likely than not that the Debtor *did* inform Edwards of his bankruptcy filing in the course of their conversation. It is clear that the Debtor believed that the Sale was stayed by his bankruptcy filing, as evidenced by his mortgage payment to the Bank. We therefore find it likely that, if the Debtor tolerated Edwards' inspection of the Home, as he did, he would have informed Edwards that the Sale was stayed. Edwards may well have "tuned out" this information because it believed that it related to prior, dismissed cases. Also, Edwards admittedly made numerous similar visits to other properties listed for Sheriff's Sales about the same time. He could well have forgotten information reported to him by the Debtor. Therefore, we accept the Debtor's version of this portion of their exchange as the more likely to be accurate.

Similarly, the Bank and Trust argue that Heidi and Bower should not be believed because Marshall clearly would have taken steps to halt the Sale had he been informed of it, and that he had no motivation to do otherwise. These observations are true as far as they go, and in light of his testimony, we are very confident that Marshall would not have let the Sale occur if he had known of the Fourth Case filing.

However, we are similarly unable to ascertain any motivations for Heidi and Bowen to have not made the calls and sent the

letter which they testify that they did. The arguments of the Bank and the Trust on these points seem to overlook the very likely scenario that a mistake was made on the receiving end of these communications by Marshall's office. We note that the Bank's loan officer, Terri Huffnagle, indicated that the Bank did make a mistake in accepting the Debtor's mortgage payment just prior to the Sale. Marshall's office could have and we find therefore did make a similar mistake in filing to stay the Sale. We note that we make these findings and in no sense intend to impugn Marshall's motivations.

We therefore find that the testimony of Heidi, Bowen, and the Debtor are credible, and that notices of the Fourth Case bankruptcy filing were provided as they testified. Those findings make this matter a much simpler matter to decide on the law under § 549(c) than D'Alfonso.

We also find this record clearer than that in D'Alfonso on the issue that Edwards did not pay "fair present equivalent value" for the Home at the Sale. We reiterate our conclusions in D'Alfonso, 211 B.R. at 517–18, following the decision of Chief Judge Fox in In re Purnell, 92 B.R. 625, 629–31 (Bankr.E.D.Pa.1988), and most other courts that have considered the question that "fair present equivalent value" under § 549(c) is not the equivalent of "reasonable equivalent value" under 11 U.S.C. § 548(a)(2). Instead, the operative terminology of § 549(c) ("fair present") is considerably more exacting than that of § 548(c)(2) ("reasonable"), and for good reason. Section 549(c) is if an exception to § 362(a) contrary to our holding at pages 633–634 supra, properly viewed as a "narrow" one to protect totally innocent parties who may be severely prejudiced by lack of notice of a judicial sale. See Purnell, supra, 92 B.R. at 629. Carrying over the holding of BFP v. Resolution Trust Corp., 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), that the price received at a sheriff's sale is presumed to be the "fair present equivalent value" of a proper-

ty sold would be, in our view, a most inapt displacement. Such a rule would encourage systems designed to create the kind of errors in acting on transmissions which we find that Marshall's office made in allowing the instant Sale to occur. It also would compromise the "automatic" aspect of the automatic stay.

In D'Alfonso we held that the failure of the purchaser to prove that "fair present equivalent value" was received was sufficient to eliminate the purchaser's § 549(c) status. Here, we have evidence that Edwards paid $87,300 for the Home which even he valued, most conservatively, at $120,000. The contrary testimony of the Debtor placing the value at $170,000 and the evidence of a much higher tax assessment of $166,000 convinces us that $120,000 is a rock-bottom value figure of the Home, and one very likely to be exceeded in its sale on the open market. In any event $87,300 is not by any means the "equivalent" of $120,000.

Therefore, rather clearly "fair present equivalent value" was not paid by Edwards at the Sale. Nor has he proven any undue prejudice which is likely to occur to him or his assignee if the Sale is invalidated. In D'Alfonso the purchaser had invested $17,000 in repairs on the property and taken out a loan secured by it. 211 B.R. at 512. Even with that sort of "real" prejudice to the purchaser at issue, which seems to be the sort of occurrences which § 549(c) meant to redress, the D'Alfonso sale was set aside.

Hence, assuming arguendo that § 549(c) applied here, and that Edwards had no knowledge of the pendency of the Fourth Case at the time of the Sale, nevertheless § 549(c) could not stand as a basis for validating the sale.

The parties supporting the validity of the Sale also have before us the Motions, and in addition, particularly the Trust, make a host of other arguments, most of which are disposed of in D'Alfonso and/or our previous opinion addressing annul-

ments of the automatic stay at length, *In re Siciliano,* 167 B.R. 999 (Bankr.E.D.Pa. 1994).

Addressing, first, the Annulment Motion, we note that the Bank argues therein as follows: (1) orders granting it relief from stay in the Debtor's prior case or cases should support relief in this case, apparently retroactively, on the grounds of *res judicata;* and (2) the Debtor's repetitious filings support a dismissal of the instant case on "bad faith" grounds.

At the outset, we note that the effect of these arguments at this stage is contradicted by Marshall's very credible testimony indicating that, had he known of the Fourth Case filing, he *would* have stayed the Sale. This, we conclude that this is a proper concession that, were the Bank to argue that the stay should be lifted or the case dismissed, Marshall would have raised these issues in this court in the normal course instead of taking it upon himself to push the Sale through on these alternative grounds.

In *Siciliano,* after an exhaustive study of most of the outstanding annulment of stay cases, we held as follows, 167 B.R. at 1007–08:

> With few exceptions, . . ., most of these courts have acknowledged that annulling the stay is only appropriate in the rarest of circumstances . . .
>
> . . . Most courts will only annul the stay, which will validate a prior action taken by a creditor in violation of the stay, if such action was taken by a creditor without its knowledge of the debtor's bankruptcy filing . . . . Furthermore, many courts will annul the stay only if the debtor is guilty of some inequitable conduct, such as abusive and/or repetitive bankruptcy filings . . . .
>
> A scenario which has been found particularly conclusive to stay annulment is when the debtor either encourages a creditor to proceed notwithstanding the stay or lies in wait for the outcome of an action by one of its creditors and only

asserts its status as a bankruptcy debtor after an unsatisfactory outcome becomes known . . . .

*See also In re Soares,* 107 F.3d 969, 976–78 (1st Cir.1997); and *D'Alfonso,* 211 B.R. at 518–20.

■ We find no evidence of the Debtor's "lying in wait" to disclose the existence of the stay. We find no actual knowledge of the Fourth Case by the Bank, but ample evidence that it should have known about it. In this regard, we note not only Heidi's call and Bowen's fax and letter but also the Bank's erroneous acceptance of the Debtor's mortgage payment shortly before the Sale.

■ We note our disagreement with the principle that an abusive filing can justify annulment of a sheriff's sale in the face of the creditor's knowledge of that filing. A contrary holding would vest in a creditor the power to unilaterally designate a filing as made in bad faith and thus subject to being disregarded. We reiterate that Marshall properly and credibly articulated no such intentions here.

■ Furthermore, we fail to find the Debtor's Fourth Case filing abusive. We are faced here with a severely disabled individual who is desperately trying to preserve his long-time, apparently historical and therefore unique residence, in which he appears to have substantial equity, as a haven for himself and his disabled daughter. We would of course prefer that the Debtor have confined his filings to a single concerted effort. We therefore intend to keep the Debtor on a straight path and a narrow leash in this case as a condition of this order in light of his numerous past unsuccessful filings, as is necessary and appropriate. *See In re Madison,* 184 B.R. 686, 692–94 (Bankr.E.D.Pa.1995). However, to retroactively eliminate the Debtor's available alternatives to a prompt, forcible eviction of himself and his daughter, such as a refinancing of the outstanding mortgages or a sale of the potentially valuable Home in the ordinary course, would be

both inhumane to him and his daughter and violative of the fundamental bankruptcy policy of preserving the Debtor's assets for the benefit of all of his creditors, such as the junior lienholders where interests were wiped out in the Sale.

In *Siciliano,* 167 B.R. at 1016, contrary to the Bank's apparent reading, we uncategorically rejected the motion that an award of stay relief in an earlier case is *res judicata* of that issue in a later case. Therein we quoted

> *In re Norris,* 39 B.R. 85, 87 (E.D.Pa. 1984). *Accord, In re Taylor,* 77 B.R. 237, 240 (9th Cir. BAP 1987), *aff'd in part & rev'd in part on other grounds,* 884 F.2d 478 (9th Cir.1989) [and stated that] [i]n *Norris,* the district court reviewed a bankruptcy court order granting prospective relief from any subsequent stay and held that "a bankruptcy judge In a pending proceeding simply does not have the power to determine that the automatic stay shall not be available in subsequent bankruptcy proceedings." 39 B.R. at 87 . . . .

We also note that relief from the automatic stay under 11 U.S.C. § 362(d)(2) appears precluded by the presence of the Debtor's substantial equity in the Home. *Compare Siciliano,* 167 B.R. at 1009–13. It is far from clear on this record, nor has it been articulated specifically what, "cause" for relief under 11 U.S.C. § 362(d)(1) is present here.

The Trust's Renewed Stay Relief Motion and Dismissal Motion appear to be largely based on a misperception of the 9/17 Order as commandeering that relief would necessarily be granted to it or Edwards if any of the three conditions set forth therein, *see* page 632 supra, were not punctiliously satisfied.

In fact, the language of the 9/17 Order, *see id.* merely states that relief "will in all probability" be granted in certain circumstances. This directive must be read in light of our dissatisfaction with the failure of the Debtor or Bowen to appear at the hearing; our uncertainty that they con-

tested the Sale at that point; and our expressed intention in the 9/17 Order to require "the Debtor to take the initiative to avoid the Sale" or "forever hold his peace as to any such argument."

■ One of the arguments recited by the Trust is that it was never properly served. We note, however, that its counsel clearly received the Complaint, filed a third party Complaint, and participated in the trial. In such circumstances, we conclude that any such objection is waived. *See* F.R.B.P. 7012(b), incorporating F.R.Civ.P. 12(h)(1) (the issue was raised only in these motions in the main case, as opposed to in any pleadings filed in the Proceeding); 2 MOORE'S FEDERAL PRACTICE, § 12.22, at 12–28 to 12–29 n. 6 ("Insufficient service may be waived through inconsistent conduct.").

As for the Debtor's failure to meet any other conditions of the 9/17 Order, we observe that the most material were surely satisfied. The Debtor did timely file the Proceeding, and has now succeeded in avoiding the Sale. The requirement of an ultimate discharge in the Chapter 13 case was added merely as a reminder to the Debtor and his counsel of the effect of 11 U.S.C. § 349(b)(2)(B) and to try to keep the instant case administratively on track.

In its brief the Trust raises a number of other "tidbit issues" which deserve no more than summary attention. Without reciting which that time bar is, the Trust states that a § 549 statutory time bar applies. Possibly this argument references § 549(d)(2) and the fact that the Fourth Case is closed. The response is that the Proceeding is based on § 362(a) as well as possibly § 549, and this issue is equivalent to a contention rejected in *D'Alfonso,* 211 B.R. at 513 ("dismissal of a case does not validate actions which constituted violations of the automatic stay during the pendency of the case."). The Trust also questions the Debtor's standing, since § 549(a) references only "the trustee's" right to invoke that Code section. However, to the

extent that the Proceeding Is based on § 549, 11 U.S.C. § 522(h)(1) confers standing on the Debtor to maintain such an action.

A challenge to the core status of the Proceeding is answered by *D'Alfonso,* 211 B.R. at 512. An argument that 11 U.S.C. § 362(h) is the exclusive remedy for a violation of § 362(a) is answered, *e.g.,* by Chief Judge Fox's decision in *In re Colon,* 114 B.R. 890, 895–96 (Bankr.E.D.Pa.1990), pointing out that stay violations have traditionally been alternatively viewed as civil contempts of court orders.

Finally, the Trust argues that the 9/17 Order neither granted nor denied relief in response to the § 362(b) motion before the Court, and therefore must be deemed to have granted relief under 11 U.S.C. § 362(e). We hold that the 9/17 Order validly "condition[ed]" the stay, 11 U.S.C. § 362(d), on certain performances by the Debtor, and therefore fully disposed of the § 362(d) motion. The Trust or Edwards was obliged to appeal that decision if they disputed the propriety of the conditions, not attempt to use it to accomplish a result totally inconsistent with its expressed aims.

Having determined, in the face of all of the contrary arguments, that the Sale must be set aside, we are unwilling to provide any additional relief to effectuate that order at this time. Rather, as in *D'Alfonso,* 211 B.R. at 520, we are not prepared to go further in determining the practical consequences of this decision without further input from the parties. We would observe that the task of unwinding the Sale is simpler than the similar task in *D'Alfonso,* where the real estate found improperly sold was non-residential realty on which, as we noted at page 636 *supra,* the purchaser had expended $17,-000 in repairs and had taken out a mortgage to finance the purchase and these repairs. *Id.* at 512.

The counterclaims and third-party complaint of the Trust may serve as the vehicle to compel the modest distributee taxing authorities to refund the sums paid to them from the Sale proceeds. The Bank and the junior mortgagees would appear entitled to restoration of their respective pre-sale priorities. As we have held herein that Edwards was not a "good faith purchaser" under § 549(c), albeit in dictum, *see* pages 635–636 *supra,* he would appear not to be entitled to a lien under that Code section. However, the unwinding of the Sale would appear to render him entitled to recover his bid money from the recovered distribution of the Sale in any event.

The confirmation hearing in the Debtor's main case, originally scheduled on January 6, 2000, was continued until February 3, 2000. That date would appear a good choice for a status hearing to determine whether the Sale can be consensually unwound; if not, what actions may be necessary by this court to accomplish this; and to determine what directives should be placed upon the Debtor in the administration of this Chapter 13 case to render it the last in his series of filings.

### D. CONCLUSION

An appropriate order effecting the conclusions reached in this Opinion follows.